IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| LUIS RAY JARAMILLO JR. | § | |
| v. | § | CIVIL ACTION NO. 6:22cv405 |
| DIRECTOR, TDCJ-CID | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The Petitioner Luis Jaramillo Jr., an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this application for the writ of habeas corpus under 28 U.S.C. §2254 complaining of disciplinary action taken against him during his confinement in TDCJ-CID, as well as claims concerning the conditions of his confinement. The petition has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I. The Petitioner's Claims**

Petitioner states that in November of 2020, he received notice from the Texas Board of Pardons and Paroles that he would be paroled and released upon completion of a sex offender rehabilitation program. He would then be released on electronic monitoring and subjected to continued sex offender therapy which he would have to pay for himself, even though he has never had a second reportable conviction and is not currently incarcerated for a sexually oriented offense.

On April 7, 2021, Petitioner states that he was moved to the Clements Unit in Amarillo for completion of a parole-voted sex offender rehabilitation program. Shortly after he arrived, Assistant Warden Joe Tovar, and some of Tovar's family members who worked at the prison, began harassing

him for having filed a previous lawsuit. He began to suffer discrimination because he was a pre-parolee in a parole-related sex offender program and unit officers wanted this program to fail.

Petitioner states that he saw officers at the Clements Unit nearly cause the death of another inmate in the pre-parole program and then try to conceal the incident. He helped this other inmate bring suit in federal court and officers at the Clements Unit began to retaliate against him through sexual harassment and falsified disciplinary cases. Petitioner states that he was transferred back to his region of origin to await a bunk at his approved halfway house, so the Clements Unit officials could not assault or kill him; as a result, Petitioner states that "false or misleading information was sent, in retaliation, by an anonymous official, to the Palestine Institutional Parole Office to have Petitioner's parole taken / withdrawn, and he was deliberately denied his procedural due process right to appeal the taking of his parole via mail tampering."

On September 25, 2021, Petitioner states that Sgt. Lucia Villegas, whom he says is Warden Tovar's niece, sexually harassed Petitioner and tried to set him up with a false disciplinary case. He reported the sexual harassment, but the unit administration refused to investigate his complaint. Petitioner states that he then contacted his family, who called the TDCJ Ombudsman's Office. An investigation was then begun by the unit PREA [Prison Rape Elimination Act] officer, Captain Turner, but she refused to investigate the security camera recordings or call for Petitioner's witnesses. As a result, Petitioner contends that Captain Turner falsified the outcome of the investigation and denied his complaint in mid-October of 2021.

On October 25, 2021, Petitioner states that he was notified of a major disciplinary case which Captain Turner gave him in retaliation for reporting staff misconduct. He says that the case was graded as a major disciplinary action by Major Villegas, who is Sgt. Villegas' father, but the hearing never occurred.

In December of 2021, Petitioner says that the discrimination became so bad that he sought an injunction against the Clements Unit officials, but the court denied it. Later that month or in January of 2022, a female officer named Robinson went to his cell to try to set him up with a sexual

misconduct charge by asking if she could see his penis because he was "cute and had a nice body." Petitioner states that he complied with this request "in fear," but then refused to show her his penis after that; as a result, he contends that she began retaliating against him with falsified disciplinary cases in an attempt to get him kicked out of the pre-parole program, to have him put in G-4 custody status, which Petitioner describes as "medium custody / high security," or to have him assaulted by officers. He told Sgt. Lopez about this, but was ignored.

On January 12, 2022, Petitioner states that he successfully completed the sex offender rehabilitation program, but began experiencing what he describes as "mysterious delays" in his out-processing for release on parole, due to sudden overly restrictive residency conditions and his placement in a state-funded halfway house, which he says violated state law and made no sense. He began to believe that the officers at the Clements Unit were not going to let him leave on parole until they had him sent to medium custody or killed. He filed a grievance on January 25, 2022, against Sgt. Lopez for his refusal to alert the PREA officer, but Captain Turner ignored it. Petitioner states that he again contacted his family, who complained to the Office of the Ombudsman, and Captain Turner reluctantly began an investigation; however, Turner refused to get witness statements and ignored Petitioner's request for a polygraph. After the investigation was resolved in favor of staff, Petitioner states that Officer Robinson was again allowed to have contact with him, even though the TDCJ Ombudsman was saying that every effort was being made to keep her away from Petitioner.

After the investigation concluded, Petitioner states that Captain Turner wrote him a false disciplinary case for giving a false statement (i.e. his complaint against Officer Robinson), in retaliation for reporting staff misconduct. A disciplinary hearing was conducted, at which Petitioner contends that he was denied the opportunity to call witnesses, his witness statements were ignored, and his request for polygraph testing was denied. When he questioned Captain Turner about her refusal to question witnesses or obtain statements, Turner replied that Petitioner had not mentioned any witnesses during her investigation, which was a lie. Petitioner states that he was found guilty

solely on Turner's falsified testimony and he was punished with cell and commissary restrictions as well as the loss of 15 days of good time.

Petitioner states that at this time, none of this information was submitted to the parole authorities. However, the Clements Unit administration manipulated the unit mailroom personnel into intercepting Petitioner's letters and applications to halfway house facilities and throwing them away. He claims this was done to delay him long enough for the unit officials to figure out a way to have his parole revoked by getting him placed in medium custody / high security.

Consequently, Petitioner states that he wrote to the deputy director of the Sex Offender Program - Rehabilitation Programs Division, complaining about sex offender program supervisor Holly Graham's failure to take any action to stop the harassment. A regional official was sent to the Clements Unit to investigate Petitioner's allegations and Petitioner asserts this official concluded that Graham had committed misconduct. Petitioner states that this alleged misconduct was not entirely related to his allegations, but also included holding back pre-parolees' records and allowing homosexual relationships to continue in the program.

At this point, Petitioner states that he was immediately and unexpectedly relocated to the Beto Unit, to await an opening for a bunk at a halfway house in Houston. He arrived at the Beto Unit on April 22, 2022, and began asking about the address of the halfway house for which he was approved for parole, as well as his release date. He states that the Beto Unit reentry department officer, Ms. Wilcoxon, deliberately delayed in her reply, and when he was finally seen for reentry outprocessing, she told him that there had been a delay in his release to Houston because the mayor of Houston had said there were too many sex offenders there; however, Petitioner states that he learned later that Wilcoxon's statement was a lie.

Instead, Petitioner states that an unknown person at the Clements Unit sent false or misleading information to the parole board to have his parole vote for release withdrawn, some four months after he had successfully completed the sex offender program and two months after he

received the disciplinary case from Captain Turner, even though this information was supposed to have been sent to the parole officials immediately after the hearing.

On May 16, 2022, Petitioner states that the parole authorities withdrew the parole vote. Petitioner states that he sent out an appeal on July 5, 2022, by certified mail, but it was never delivered. Petitioner says that his family spoke to a parole officer in Palestine to ask about it, telling the officer that legal action would be taken if the appeal was not found, and on August 9, 2022, the appeal showed up and was hand-delivered to Petitioner by the mailroom staff, together with what Petitioner describes as an "unbelievable explanation and story." He states that the envelope had a "phony post office post-marked stamp dated insignia." The mailroom staff told him they thought the envelope sat untouched on the desk of Kristi Mitchell, the regional parole supervisor, until it was returned after Petitioner's family threatened legal action, but Petitioner says he does not think it ever left the unit mailroom. He surmises that Warden Collum, a defendant in a prior lawsuit filed by Petitioner, was involved in the sabotage of his parole appeal.

For relief, Petitioner asks that the Court "make inquiry and specific findings to reverse the irreparable harm and inquiry that continues to harm him, to enforce the proper procedures of offender protection safeguards, reversal of the unconstitutional disciplinary conviction and reinstatement and/or restoration of 15 days good time, to reinstate and/or restore his parole and speedier/immediate release on parole for his safety."

## II. Legal Standards and Analysis

The primary issue in the case is whether Petitioner has stated the denial of a constitutionally protected liberty interest. The Supreme Court has held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life. Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

While some prior cases held that the mandatory or discretionary language of the regulations involved determined whether or not a liberty interest existed, the Supreme Court announced in Sandin that this analytical framework has "strayed from the real concerns undergirding the liberty protected by the Due Process Clause." Rather than examining the language of the regulations, the Supreme Court specifically disapproved of the mandatory or discretionary language analysis, stating that the operative interest involved was the nature of the deprivation. Sandin, 515 U.S. at 473 and n.5. In other words, those deprivations - the punishments imposed as a result of the challenged disciplinary case - which do not exceed the prisoner's sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, and which do not impose atypical or significant hardships upon the prisoner in relation to the ordinary incidents of prison life, do not implicate any constitutionally protected liberty interests.

The Supreme Court cited Vitek v. Jones, 445 U.S. 480, 493-94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (transfer to mental hospital triggers Due Process Clause) and Washington v. Harper, 494 U.S. 210, 221-222, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (involuntary administration of psychotropic drugs implicates Due Process Clause), as examples of restraints which trigger the Due Process Clause of their own force, but stated that the incarceration in disciplinary segregation present in Sandin did not create the type of deprivation in which the State might have created a liberty interest. Sandin, 515 U.S. at 479 n.4, 481-82. As a result, the Supreme Court held that neither the prison regulations at issue nor the Due Process Clause itself afforded the inmate a protected liberty interest entitling him to the procedural protections of Wolff v. McDonnell, 418 U.S. 539, 563-66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Sandin, 515 U.S. at 487. The fact that the plaintiff was not permitted to call witnesses at his disciplinary hearing was not sufficient to accord him relief because no protected liberty interest was at stake.

In this case, Petitioner states that he received cell and commissary restrictions as well as the loss of 15 days of good time credits. He says he does not remember if he was reduced in classification status. The punishments of cell and commissary restrictions, and reduction in classification status, do not exceed Petitioner's sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nor do they impose atypical or significant hardships in relation to the ordinary incidents of prison life. *See* Malchi v. Thaler, 211 F.3d 953, 958 (5th Cir. 2000) (cell restrictions do not implicate a protected liberty interest); Wilson v. Budney, 976 F.2d 957, 958 (5th Cir. 1992) (no protected liberty interest in custodial classification); Lewis v. Dretke, 54 F.App'x 795, 2002 U.S. App. LEXIS 28227, 2002 WL 31845293 (5th Cir., December 11, 2002) (30 days of cell and commissary restrictions, including restrictions of recreation and attending religious services and library sessions, plus 90 days of telephone restrictions, 15 days of solitary confinement, and reductions in classification and custodial status did not implicate any protected liberty interests). Petitioner has not set out a constitutional violation regarding these deprivations.

Petitioner also states that he lost 15 days of good time credits. Under certain conditions, the loss of good time could inflict a punishment imposing an atypical and significant hardship upon an inmate, because the loss of such time could result in the denial of a liberty interest in early release from prison. This condition exists where an inmate is eligible for release on mandatory supervision. *See* Madison v. Parker, 104 F.3d 765, 768 (5th Cir. 1997) (release on mandatory supervision is arguably a liberty interest in the State of Texas). However, Petitioner acknowledges that he is not eligible for release on mandatory supervision.

Consequently, the loss of good time serves only to affect Petitioner's possible release on parole, inasmuch as Texas law provides that the sole purpose of good time credits is to accelerate eligibility for release on parole or mandatory supervision. Tex. Gov. Code art. 498.003(a). The Fifth Circuit has expressly held that there is no constitutional right to release on parole in the State of Texas. Creel v. Keene, 928 F.2d 707, 708-09 (5th Cir. 1991); Allison v. Kyle, 66 F.3d 71, 74 (5th Cir. 1995). Under these circumstances, the loss of good time credits do not affect a constitutionally protected right, but only the "mere hope" of release on parole. This hope is not protected by due

process. *See* Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 11, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *accord*, Gilbertson v. Texas Board of Pardons and Paroles, 993 F.2d 74, 75 (5th Cir. 1993). In addition, the timing of Petitioner's release is too speculative to give rise to a constitutionally protected liberty interest. Malchi, 211 F.3d at 959. Thus, for Petitioner, the loss of good time does not trigger the Due Process Clause of its own force, nor does it impose atypical or significant hardships in relation to the ordinary incidents of prison life. *See also* Washington v. Davis, 792 F.App'x 331, 2020 U.S. App. LEXIS 3303, 2020 WL 536215 (5th Cir., February 3, 2020) (where an inmate is ineligible for mandatory supervision, the loss of good time credits - as well as punishments such as loss of recreation and commissary privileges, cell restrictions, and change in line class - do not implicate due process concerns because they do not implicate protected liberty interests), *citing* Sandin, 515 U.S. at 484. Because Petitioner has failed to show that any of the punishments imposed upon him implicate any protected liberty interests, his claim for habeas corpus relief is without merit.

For the same reason, the fact that the Board of Pardons and Paroles withdrew Petitioner's parole approval, and he was not released on parole when he was originally told that he would be, does not implicate a protected liberty interest. The Fifth Circuit has held that Texas prisoners lack a liberty interest in parole under state law and thus cannot mount a challenge against any state parole review procedure on procedural or substantive grounds. Johnson v. Rodriguez, 110 F.3d 299, 308 (5th Cir. 1999); Martinez v. Abbott, 796 F.3d 196 (5th Cir. 2019). Because he lacks a liberty interest in parole, his claim for habeas corpus relief concerning the failure to release him on parole is without merit.

In any event, Texas law provides that parole approval is not effective or final until a formal parole agreement is executed by the offender, and the approval may be withdrawn by a parole panel at any time prior to the acceptance and execution by the offender of the formal parole agreements contained in the parole certificate. Tex. Admin. Code. §145.20(b); *see also* Sexton v. Wise, 494 F.2d 1176, 1178 (5th Cir. 1974); Clifford v. Beto, 464 F.2d 1191, 1194 (5th Cir. 1972).

Petitioner also raises a number of claims which do not implicate the fact or legality of his confinement. These include his claims that he was harassed and retaliated against for filing a previous lawsuit, he was sexually harassed by Sgt. Villegas, Captain Turner refused to investigate

8

or take action regarding this sexual harassment, he was sexually harassed by Officer Robinson, and his mail was tampered with. The Fifth Circuit has stated that where a habeas corpus petition raises non-habeas claims, these claims should be analyzed to see if they raise potential issues that are cognizable under 42 U.S.C. §1983. *See, e.g.*, Emmett v. Thaler, 379 F.App'x 321, 2010 U.S. App. LEXIS 10180, 2010 WL 2008464 (5th Cir., May 19, 2010), *citing* Eason v. Thaler, 14 F.3d 8, 9 (5th Cir. 1994) *and* Serio v. Members of La. State Board of Pardons, 821 F.2d 1112, 1119 (5th Cir. 1987). In Birl v. Thaler, 470 F.App'x 362, 2012 U.S. App. LEXIS 9259, 2012 WL 1578921 (5th Cir., May 7, 2012), the Fifth Circuit stated as follows:

> We have held that, 'in instances in which a petition contains claims that should be asserted in habeas with claims that properly may be pursued as an initial matter under §1983, and the claims can be separated, federal courts should do so, entertaining the §1983 claims.'

In this case, Petitioner raises claims which may be pursued as an initial matter under 42 U.S.C. §1983, and these claims can be separated from his habeas corpus claims. As this Court has previously observed, the Fifth Circuit cases on this issue do not address the issue of the filing fees required by the Prison Litigation Reform Act of 1996. Congress could not have intended, and this Court declines to hold, that prisoners can evade the filing fees on §1983 lawsuits by the simple expedient of filing such claims in habeas corpus petitions, to which the fees of the Prison Litigation Reform Act do not apply. *See* Howard v. Director, TDCJ, civil action no. 9:11cv148, 2013 U.S. Dist. LEXIS 58903, 2013 WL 949380 (E.D.Tex., February 6, 2013), *Report adopted at* 2013 U.S. Dist. LEXIS 32847, 2013 WL 943437 (E.D.Tex., March 8, 2013, no appeal taken). Petitioner's claims of harassment, retaliation, failure to investigate, and mail tampering should be separated by severance into a new lawsuit, upon which the fee requirements shall apply, and the dismissal of the present case should not affect these claims in any way. With regard to the fee requirements, the Court notes that Petitioner has three strikes and thus cannot proceed *in forma pauperis* absent a showing of imminent danger of serious physical injury concerning the incidents forming the basis of the lawsuit. *See* Jaramillo v. Pace, civil action no. 6:22cv256 (E.D.Tex., Report and Recommendation dated August 2, 2022) (noting that Petitioner has three strikes).

**III. Conclusion**

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding unless a circuit justice or the district court judge issues a certificate of appealability. 28 U.S.C. §2253(c)(1)(A). A district court may deny a certificate of appealability *sua sponte* because the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. *See* Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000).

The prerequisite for a certificate of appealability is a substantial showing that the petitioner has been denied a federal right. Newby v. Johnson, 81 F.3d 567, 569 (5th Cir. 1996). This requires the petitioner to demonstrate that the issues are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. James v. Cain, 50 F.3d 1327, 1330 (5th Cir. 1995).

Petitioner has failed to make a substantial showing that he has been denied a federal right. Nor has he shown that the issues are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. Consequently, Petitioner is not entitled to a certificate of appealability.

RECOMMENDATION

It is accordingly recommended that the above-styled application for the writ of habeas corpus be dismissed with prejudice and that a certificate of appealability be denied *sua sponte*. It is further recommended that Petitioner's claims concerning harassment, retaliation, failure to investigate, and mail tampering be severed from this petition into a new lawsuit under 42 U.S.C. §1983.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the

Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See* Battle v. United States Parole Commission, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. Duarte v. City of Lewisville, 858 F.3d 348, 352 (5th Cir. 2017).

**So ORDERED and SIGNED this 4th day of November, 2022.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE